599 P.2d 127 (1979)
SHELDON JACKSON COLLEGE, Appellant,
v.
STATE of Alaska, Avrum Gross, Attorney General for the State of Alaska, B.B. Allen, Commissioner of Administration for the State of Alaska, Kerry Romesburg, Executive Director, Post-Secondary Education Commission, Marshall L. Lind, Commissioner of Education for the State of Alaska, Appellees.
INUPIAT UNIVERSITY OF the ARCTIC, Appellant,
v.
STATE of Alaska, Avrum Gross, Attorney General for the State of Alaska, B.B. Allen, Commissioner of Administration for the State of Alaska, Kerry Romesburg, Executive Director, Post-Secondary Education Commission, Marshall L. Lind, Commissioner of Education for the State of Alaska, Appellees.
Nos. 3978, 4002.
Supreme Court of Alaska.
August 28, 1979.
*128 Monte L. Brice, Ely, Guess & Rudd, Juneau, for Sheldon Jackson.
B. Richard Edwards, Mark S. Bledsoe, Anchorage, for Inupiat University of the Arctic.
Ronald W. Lorensen, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellees.
Robert C. Erwin, Sanford M. Gibbs of Hagans, Smith, Brown, Erwin & Gibbs, Anchorage, for amicus curiae.
Before RABINOWITZ, C.J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

OPINION
MATTHEWS, Justice.
The final sentence of article VII, section 1 of our state constitution prohibits the payment of money from public funds "for the direct benefit of any religious or other private educational institution."[1] The question in this case is whether Alaska's tuition grant program, AS 14.40.751-.806, violates this provision.
The tuition grant program awards Alaska residents attending private colleges in Alaska an amount generally equal to the difference between the tuition charged by the student's private college and the tuition charged by a public college in the same area, not to exceed $2,500.00 annually. The student is required to apply the entire amount of the grant towards his or her tuition. AS 14.40.776(a).
In May of 1976 the attorney general issued an opinion declaring tuition grants to be invalid as a direct benefit to private schools in violation of article VII, section 1. The Department of Administration then stopped paying tuition grants. Appellant Sheldon Jackson College, a private educational institution, filed suit to enjoin the department's termination order, but agreed to dismiss the suit without prejudice when a proposition to amend article VII, section 1, to permit tuition grants was placed on the ballot to be voted on in the general election of November, 1976.[2]
The ballot proposition was rejected by the voters 64,211 to 54,636. Sheldon Jackson then renewed its lawsuit and another private university, Inupiat University of the Arctic, filed a complaint in intervention. The superior court concluded that the tuition grant program provides direct benefits to private educational institutions and thus violates article VII, section 1. Summary judgment was thereupon granted in favor of the state. We affirm.

*129 I
The minutes of the Alaska Constitutional Convention show that an unsuccessful motion was made to delete entirely the direct benefit prohibition of article VII, section 1.[3] The proponent of the motion argued that the state constitutional provisions prohibiting the establishment of religion[4] and prohibiting spending public funds for private purposes,[5] were sufficient to accomplish the objectives of the direct benefit clause. By rejecting this proposal the convention made it clear that it wished the constitution to support and protect a strong system of public schools.[6] Other authorities have also suggested that a constitutional provision barring aid to all private schools serves to enforce the separation of church and state without requiring executive or judicial inquiry into the sectarian affiliation of particular schools,[7] and furthermore disengages the state from the undesirable task of withholding benefits solely on the basis of religious affiliation.[8]
At the same time, in expressly rejecting alternative language that would have prohibited "direct or indirect benefits,"[9] the delegates to Alaska's Constitutional Convention made it abundantly clear that they did not wish to prevent the state from providing for the health and welfare of private school students,[10] or from focusing on the special needs of individual residents.[11] Article VII, section 1 was thus designed to commit Alaska to the pursuit of public, not private education, without requiring absolute governmental indifference to any student choosing to be educated outside the public school system.
The Alaska Constitution is apparently unique in its express ban only on "direct" benefits. However, in construing state constitutional provisions that prohibit "support" for private schools,[12] or state and federal proscriptions against the establishment of religion,[13] the courts have frequently resorted to a distinction between "direct" and "incidental" benefits.[14] Though the distinction may at times appear more "metaphysical" *130 than precise,[15] the analyses found in these decisions are helpful in determining generally the type of government action intended to be prohibited by article VII's direct benefit clause. The following generalizations can be drawn from these authorities.
First, constitutional provisions governing aid to private schools have generally been perceived as requiring neutrality rather than hostility from the state;[16] thus the breadth of the class to which statutory benefits are directed is a critical area of judicial scrutiny.[17] For example, though the police and fire protection afforded a private school may provide the school with quite direct benefits, as when a campus fire is extinguished, such benefits are provided without regard to status and affiliation, and have universally been presumed to be constitutional.[18] Conversely, a benefit flowing only to private institutions, or to those served by them, does not reflect the same neutrality and non-selectivity.[19]
A second central criterion in determining the constitutionality of a state aid program, is the nature of the use to which the public funds are to be put. As is apparent from the convention debate, the core of the concern expressed in the direct benefit prohibition involves government aid to education conducted outside the public schools. Though any state assistance that relieves the burden on a private school to provide for the health and welfare of its students will free the school to concentrate its funds on its private educational mission, numerous delegates voiced their understanding that the direct benefit clause would not bar such incidental support.[20] An analogous distinction has frequently been drawn in establishment clause cases, where the pertinent inquiry is whether a statute impacts "essentially secular educational functions" that are separable from the school's religious instruction.[21]
Third, in determining whether a school is directly benefitted by public funds, a court must consider, though not in isolation, the magnitude of the benefit conferred. A trivial, though direct, benefit may not rise to the level of a constitutional violation, whereas a substantial, though arguably indirect, benefit may.[22]
Finally, while a direct transfer of funds from the state to a private school will of course render a program constitutionally suspect,[23] merely channeling the funds through an intermediary will not save an otherwise improper expenditure of public monies. The courts have expressly noted *131 that the superficial form of a benefit will not suffice to define its substantive character.[24]

II
The foregoing observations are readily applicable to the present case. First, the class primarily benefitted by the tuition grant program consists only of private colleges and their students. Though the appellants characterize the statute as merely equalizing the positions of private and public university students, effectively the chief beneficiaries are the private colleges themselves. Unlike a statute that provides comparable dollar subsidies to all students,[25] Alaska's tuition grant program is not neutral, inasmuch as the only incentive it creates is the incentive to enroll in a private college. Subsidy programs suffering from similar deficiencies have been repeatedly struck down under a variety of state constitutional provisions,[26] as well as under the Federal Constitution.[27]
Second, the public funds expended under AS 14.40.776 constitute nothing less than a subsidy of the education received by the student at his or her private college, and thus implicate fully the core concern of the direct benefit provision. While the program may be motivated, as was stated in the preface to the statute as it was originally passed, by the desire to "help retain qualified students in Alaska,"[28] such a laudable purpose cannot escape article VII's mandate that Alaska pursue its educational objectives through public educational institutions.
Furthermore, the magnitude of benefits bestowed under the tuition grant program is quite substantial. For the last year in which the tuition grants were paid, 1975-76, Sheldon Jackson received approximately six hundred thousand dollars from the program. The grants were then $1,850 for each eligible student,[29] and for the 1976-77 school year the grants were to be $2,500.[30] According to Sheldon Jackson it has suffered *132 "a substantially diminished capacity" to function as an educational institution as a result of the termination of the tuition grant program, as reflected in a reduction of students, faculty, income and curriculum offerings. Inupiat University claims a similar impairment of function.
Finally, though the tuition grants are nominally paid from the public treasury directly to the student, the student here is merely a conduit for the transmission of state funds to private colleges. Before the state will deliver a check to the student, the latter must certify under oath and under penalty of perjury that he or she will pay it over to the college. AS 14.40.786. Simply interposing an intermediary "does not have a cleansing effect and somehow cause the funds to lose their identity as public funds. While the ingenuity of man is apparently limitless, the Court has held with unvarying regularity that one may not do by indirection what is forbidden directly." Wolman v. Essex, 342 F. Supp. 399, 415 (S.D.Ohio), aff'd mem., 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972).
Based on the foregoing we have no difficulty in concluding that the tuition grant program is in its effect a direct benefit to private educational institutions and therefore violates article VII, section 1 of our constitution. Though Sheldon Jackson points out that several courts have upheld tuition grant programs involving college students,[31] and that aid programs involving colleges have more readily been found constitutional than similar programs involving elementary and secondary schools,[32] the cited decisions rely on the de minimis degree of church control in the benefitted sectarian colleges. Such reasoning obviously has no application with respect to article VII's direct benefit prohibition, which bans aid to all private educational institutions, including those with no religious affiliation.
Sheldon Jackson also argues that the direct benefit clause was not meant to apply to colleges and universities, but only to primary and secondary private educational institutions. We see no basis for this contention. Both the plain language of the constitution and the minutes of the constitutional debate[33] indicate that all private educational institutions were meant to be included. The judgment is AFFIRMED.
NOTES
[1] Art. VII, § 1 of the Alaska Const. provides:

Public Education. The legislature shall by general law establish and maintain a system of public schools open to all children of the State, and may provide for other public educational institutions. Schools and institutions so established shall be free from sectarian control. No money shall be paid from public funds for the direct benefit of any religious or other private educational institution.
[2] The proposition would have appended the following language to art. VII, § 1: "however nothing in this section shall prevent direct aid to students in accordance with the law." 1976 House Joint Resolution 73 am S. In addition an explanation of the amendment appeared on the ballot as follows:

This is a proposal to amend Article VII, Section I of the Constitution of the State of Alaska to allow public funds to be used to provide direct aid such as scholarships and tuition equalization grants to students attending private educational institutions. The Attorney General of the State of Alaska has interpreted Article VII, Section I of the constitution as it now reads, to prohibit the state from giving tuition equalization grants to students attending private colleges or universities in the state.
[3] 2 Proceedings of the Alaska Constitutional Convention 1526-28 (hereafter cited as Proceedings).
[4] Art. 1, § 4 provides in part: "No law shall be made respecting an establishment of religion... ."
[5] Art. IX, § 6 provides: "No tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose."
[6] For example, delegate Armstrong, speaking for the committee which drafted art. VII, § 7, stated that it had sought to "provide and protect for the future of our public schools." 2 Proceedings at 1514. Delegate Coghill expressed the thought that the amount of tax dollars available for the support of public schools might be lessened if public funds were used to support a great many private schools. Id. at 1520. In Spears v. Honda, 51 Haw. 103, 449 P.2d 130, 135 (1968), the need to ensure that public schools would not be neglected is expressed as the reason underlying Hawaii's constitutional bar to public aid of private schools. Hawaii, however, apparently had an elite private school system, a system having no strong parallels in the Territory of Alaska.
[7] See Gaffney v. State Bd. of Educ., 192 Neb. 358, 220 N.W.2d 550, 553 (1974).
[8] See Everson v. Bd. of Educ., 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711, 724 (1947); Spears v. Honda, 51 Haw. 103, 449 P.2d 130, 137 (1968).
[9] 2 Proceedings, supra note 3 at 1528.
[10] Id. at 1513-16, 1519-20, 1521-22, 1524.
[11] Id. at 1514.
[12] E.g., Mo. Const. art. IX, § 8.
[13] U.S. Const. amend. I provides in part: "Congress shall make no law respecting an establishment of religion... ."
[14] See, e.g., Wolman v. Walter, 433 U.S. 229, 250, 254, 97 S.Ct. 2593, 2606, 2609, 53 L.Ed.2d 714, 733 (1977); Meek v. Pittenger, 421 U.S. 349, 364-65, 95 S.Ct. 1753, 1762-63, 44 L.Ed.2d 219, 231 (1975); Comm. for Publ. Educ. v. Nyquist 413 U.S. 756, 783 n. 39, 93 S.Ct. 2955, 2971 n. 39, 37 L.Ed.2d 948, 969 n. 39 (1973); Americans United v. Rogers, 538 S.W.2d 711, 719 (Mo.), cert. denied, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976). Though the Federal Constitution does not explicitly refer to the relationship between the government and religious schools, the Supreme Court's "direct benefit" standard has been formulated almost exclusively in the context of school aid cases, supra, and is thus valuable precedent in construing our own constitutional provision.
[15] See L. Tribe, American Constitutional Law 840 (1978).
[16] See Roemer v. Bd. of Publ. Works of Md., 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed. 179, 188 (1976); Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745, 756 (1971); Everson v. Bd. of Educ., 330 U.S. 1, 18, 67 S.Ct. 504, 512, 91 L.Ed. 714, 724-25 (1947).
[17] See, e.g., Comm. for Publ. Educ. v. Nyquist, 413 U.S. 756, 782 n. 38, 93 S.Ct. 2955, 2970 n. 38, 37 L.Ed.2d 948, 968 n. 38 (1973); Springfield Schl. Dist. v. Dept. of Educ., 483 Pa. 539, 397 A.2d 1154, 1163 (1979).
[18] See citations supra notes 16 and 17.
[19] See infra notes 26 and 27.
[20] See supra note 10. In Matthews v. Quinton, 362 P.2d 932 (Alaska 1961); cert. denied, 368 U.S. 517, 82 S.Ct. 530, 7 L.Ed.2d 522 (1962), a statute enabling private school children living far from their schools to ride public school buses at public expense, was held violative of the direct benefit prohibition. We do not rely on Matthews in reaching today's decision, and thus have no occasion to overrule or re-affirm it. A substantial question, however, can be raised as to its continuing vitality in light of the analysis which we employ in the present opinion.
[21] Roemer v. Bd of Publ. Works of Md., 426 U.S. 736, 762, 96 S.Ct. 2337, 2352, 49 L.Ed.2d 179, 197 (1976). See Meek v. Pittenger, 421 U.S. 349, 366, 95 S.Ct. 1753, 1763, 44 L.Ed.2d 217, 232 (1975).
[22] Compare Lendall v. Cook, 432 F. Supp. 971 (E.D.Ark. 1977) (program involving eight scholarships upheld), with Meek v. Pittenger (striking down a state loan of nonideological instructional materials, in part on the basis of the substantiality of aid to the overall functioning of the benefitted schools).
[23] Id.
[24] Wolman v. Walter, 433 U.S. 229, 250, 97 S.Ct. 2593, 2606, 53 L.Ed.2d 714, 733-34 (1977) (striking down a loan of instructional materials to students after similar loan to schools had been struck down in Meek); Comm. for Publ. Educ. v. Nyquist, 413 U.S. 756, 785-86, 93 S.Ct. 2955, 2972, 37 L.Ed.2d 948, 970 (1973) (striking down reimbursements to parents for private school tuitions).
[25] Minn. Civ. Lib. U. v. Roemer, 452 F. Supp. 1316, 1322 (D.Minn. 1978) (tax deduction for parents of all school children upheld); Americans United for the Sep. of Ch. and State v. Blanton, 433 F. Supp. 97 (M.D.Tenn.), aff'd mem., 434 U.S. 803, 98 S.Ct. 39, 54 L.Ed.2d 65 (1977) (public and private college students eligible for grants); Durham v. McLeod, 259 S.C. 409, 192 S.E.2d 202 (1972), appeal dismissed for lack of a substantial federal question, 413 U.S. 902, 93 S.Ct. 3060, 37 L.Ed.2d 1020 (1973) (loans to all college students). But see Miller v. Ayres, 213 Va. 251, 191 S.E.2d 261 (1972) (conditional grants to public and private college students held unconstitutional); Weiss v. Bruno, 82 Wash.2d 199, 509 P.2d 973 (1973) (grants to needy private school children not saved by summer school grants to needy public school children).
[26] See Klinger v. Howlett, 56 Ill.2d 1, 305 N.E.2d 129 (1973); Opinion of the Justices, 357 Mass. 846, 259 N.E.2d 564 (1970); Opinion of the Justices, 109 N.H. 578, 258 A.2d 343 (1969).
[27] Comm. for Publ. Educ. v. Nyquist, 413 U.S. 756, 782 n. 38, 93 S.Ct. 2955, 2970 n. 38, 37 L.Ed.2d 948, 968 n. 38 (1973) (tuition reimbursement to parents of non-public school children); Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973) (tuition reimbursement); Wolman v. Essex, 342 F. Supp. 399, 412 (S.D.Ohio), aff'd mem., 409 U.S. 808, 93 S.Ct. 61, 34 L.Ed.2d 69 (1972) ("[t]he reimbursement grant aspects ... are directed only towards the parents of children who attend non-public schools"). See also Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) (auxiliary services only provided to non-public school students); Publ. Funds for Publ. Schools of N.J. v. Marburger, 358 F. Supp. 29 (D.N.J. 1973), aff'd mem., 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974) (private school students reimbursed for textbooks while public schoolers only loaned books); Members of Jamestown Schl. Comm. v. Schmidt, 427 F. Supp. 1338, 1348 (D.R.I. 1977) (only private school students bused out of district); Americans United for Sep. of Ch. and State v. Benton, 413 F. Supp. 955 (D.Iowa 1976) (same).
[28] Section 1 ch. 230 SLA 1970.
[29] Section 2 ch. 136 SLA 1975.
[30] AS 14.40.776(a)(2).
[31] Lendall v. Cook, 432 F. Supp. 971 (E.D.Ark. 1977); Americans United for Sep. of Ch. and State v. Bubb, 379 F. Supp. 872 (D.Kan. 1974) (upheld with respect to most, but not all, church-related schools); Americans United v. Rogers, 538 S.W.2d 711 (Mo.), cert. denied, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976).
[32] See Roemer v. Bd of Publ. Works of Md., 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (non-categorical grants to colleges); Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (state leaseback arrangement with Baptist college); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (construction grants to colleges).
[33] The convention delegates were informed by the chairperson of the authoring committee that the committee intended the phrase "other private educational institutions" to include "any educational institution that is not run by the state." 2 Proceedings, supra note 3 at 1511. See also id. at 1532.