REQUESTED BY: Senator Chris Beutler, Nebraska State Legislature
You have inquired regarding the legality of LB 72 which would impose a new form of community consent as a prerequisite for licensing of a low-level radioactive waste facility. You ask whether the new form of community consent is consistent with the State's obligations under the statutes of the State of Nebraska, the Constitutions of the State and United States, and the Central Interstate Low-Level Radioactive Waste Compact. You have also inquired whether any legal liability would be created for the State if LB 72 is passed and results in a negative vote by the "local community,"
Your letter indicates no specific statutes which you wish this office to address directly. Therefore, we have limited our statutory review to the Nebraska Low-Level Radioactive Waste Act, Neb.Rev.Stat. §§ 81-1578 et seq. (Reissue 1987 and 1990 Cum. Supp.). Section 81-1759(3) (1990 Cum. Supp.) states in relevant part:
It is the intent of the Legislature that potential host communities be actively and voluntarily involved in the siting process. To the extent possible, consistent with the highest level of protection for the health and safety of the citizens of the state and protection of the environment, the developer shall make every effort to locate the facility where community support is evident.
This part of the statute was enacted in 1988 as part of LB 1092. LB 1092 originally contained a provision requiring community consent prior to construction of a facility. After considerable debate, the requirement for community consent was amended as reflected above. We find no conflict between the requirement for community consent in LB 72 and the State's obligations under the Low-Level Radioactive Waste Act.
The Central Interstate Low-Level Radioactive Waste Compact was passed by the Legislature in 1983 and was subsequently ratified by the United States Congress. As indicated in the attachments to your question, the members of the Compact Commission passed a resolution in December, 1987, adopting ten conditions, including community consent, as generic conditions that would apply in the event of any state selection as a host state. Dr. Norm Thorson, on behalf of the State of Nebraska, presented the ten conditions to the Commission. In discussing the concept of community consent, Dr. Thorson stated:
We feel that the precise mechanism that would be used to determine when you had community consent is a matter which is properly left to the host state, whichever state that might be.
I think it is necessary that there be some finality in the process; that a point in time be set when a community must indicate whether they're willing to be considered or not, and that then becomes their decision. You obviously can't have a situation where people are opting in and opting out of the process.
(Minutes of December 8, 1987, Compact Commission meeting, p. 64).
At the beginning of the siting process U Ecology sought letters of interest from communities and counties throughout the state who were interested in hosting the facility. In line with Neb.Rev.Stat. §81-1579(3), a letter of interest would "not constitute a commitment to host the facility" but merely focus the developer's efforts on those regions of the state "willing to objectively consider the project" (US Ecology Press Release, March 15, 1988).
As a result of this request, US Ecology received letters of interest from numerous cities and counties throughout the state, including letters from the Boyd County Board of Supervisors and the communities of Butte and Lynch. Approximately eight days prior to selection of a preferred site, the Boyd County Supervisors withdrew their "invitation" to US Ecology.
We have reviewed the Compact and the above history and find no conflict between LB 72 and the Central Interstate Low-Level Radioactive Waste Compact. Additionally, since the Compact Commission passed a resolution requiring community consent, it would appear that the Commission supported the concept of community consent.
In Lenstrom v. Thone, 209 Neb. 783, 789, 311 N.W.2d 884, 888
(1981), the Nebraska Supreme Court stated:
Certain fundamental constitutional principles must guide, and always have guided, us when the constitutional bounds of legislative power are questioned. The first principle is the Legislature has plenary legislative authority limited only by the state and federal Constitutions. . . . The Nebraska Constitution is not a grant but, rather, a restriction on legislative power, and the Legislature may legislate on any subject not inhibited by the Constitution Unless restricted
by some provision of the state or federal Constitution, the Legislature may enact laws and appropriate funds for the accomplishment of any public purpose.
With this principle in mind, we have reviewed LB 72 as it relates to the restrictions set out in the state and federal Constitutions. As stated previously, the Compact Commission passed a resolution in December, 1988 calling for community consent prior to siting of a facility and leaving the definition of community consent to the host state. In January, 1988, when the developer entered into his contract with the Compact Commission, the resolution regarding community consent had already been passed by the Compact Commission. The developer was well aware that the Compact Commission required community consent and that the host state could determine how community consent would be defined. Arguably, LB 72 does not alter the contract but merely provides the host state's definition of community consent pursuant to the resolution passed by the Compact Commission.
Additionally, in City of E1 Paso v. Simmons, 379 U.S. 497, 506
(1965), the United States Supreme Court stated:
For it is not every modification of a contractual promise that impairs the obligation of contract under federal law, any more than it is every alteration of existing remedies that violates the Contract Clause. (Citations omitted.)
The decisions "put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula," as Chief Justice Hughes said in Home Building 
Loan Assn. v. Blaisdell, 290 U.S. 398, 428, 54 S.Ct. 231, 236. The Blaisdell opinion, which amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause, makes it quite clear that "not only is the constitutional provision qualified by the measure of control which the state retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect.' Stephenson v. Binford, 287 U.S. 251, 276, 53 S.Ct. 181,189, 77 L.Ed. 288. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. * * * This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this "Court."290 U.S. at 434-435, 54 S.Ct. at 238-239. Moreover, the "economic interests of the state may Justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts." Id., at 437, 54 S.Ct., at 239. The State has the "sovereign right * * to protect the * * * general welfare of the people * * *. Once we are in this domain of the reserve power of a State we must respect the "wide discretion on the part of the legislature in determining what is and what is not necessary.'" East New York Savings Bank v. Hahn, 326 U.S. 230, 232-233,66 S.Ct. 69, 71. As Mr. Justice Johnson said in Oden v. Saunders "[i]t is the motive, the policy, the object, that-must characterize the legislative act, to affect it with the imputation of violating the obligation of contracts." 12 Wheat 213, 291, 6 L.Ed. 606.
The passage of LB 72 may well have no affect on the contract between the Compact Commission and the developers since it provides for a timely vote to determine community consent. If the vote reflects that there is no community consent, the current contract contains clauses that provide for amendment of the work plan to carry out the intent of the parties if future events demand changes. The contract also contains a termination clause that should the Compact states, local government of the host state, or federal government prevent or make it impossible for the developer or the Compact to perform its duties or obligations under the contract that the contract can be terminated.
While we are concerned with the timeliness of LB 72 in relation to the contract, it is our determination that community consent was in the contemplation of the parties at the time they entered into the contract and that the state's inherent powers to protect the general welfare of the people justify the requirement of community consent. Therefore, we determine that LB 72 does not violate the Constitution of the United States or the State of Nebraska.
In response to your question regarding the affect of failure to obtain community consent under LB 72, we refer you to our earlier Opinion No. 89045, a copy of which is attached hereto.
Sincerely,
 DON STENBERG Attorney General